We will now proceed on to the case of United States v. Barronette and others. What do we have? A total of eight defendants and we will hear first from Mr. Klepper. Thank you, may it please the court, and it is good to see everyone in person. I am here representing Dennis Pulley and the other seven defendants, I will be arguing on everyone's behalf for issue four, the courtroom closure, and then on issue six for Mr. Pulley's particular issues under the Greer case. The founding generation put the right to public trial in the Sixth Amendment, and it is fundamental, not a technical. And Justice Black said that without exception, all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present no matter what And so closing the courtroom, even partially, is a very big decision because this is one of those errors where the only remedy is a new trial, it is structural error. So the district court has to be sure. The brief spend a lot of time, and I guess you're going to go that same direction, talking about closure, and I would much prefer to see us arguing about the limitation on access, which I think there are a lot of distinguishing factors. In other words, a lot of the principles for closure are not existent in a restriction of access. And so the question is, there was a restriction, and I think we all agree here, the courtroom wasn't closed, it was, I mean, if you have a thousand people out in the courtyard wanting to come into the court, we're not going to let them all in. So the question in this case is whether the restrictions were justified, and I'd like you to, if you argue policies, or historical policies, that you keep it to that and not the total closure. We understand. Understood, Your Honor. And I actually intend to focus almost entirely on the nature of what would be called in the parlance a partial closure. Now, the key to the government's argument is, don't worry, courtroom 70 was available for audio only overflow. And the defendant secured a ruling at the beginning of trial, that an objection for one defendant was an objection for all unless anyone opted out. And originally, Judge Blake said, you have to opt in, and the attorney said, does that really work with eight defendants? She said, you're right, you just have to opt out. And so October 8th, after day nine of 25, Mr. Harrison moved for mistrial, in full, not just as to him, submitting affidavits, not just from his friend, Ms. Hamlin, but from Mr. Floyd's mother, Ms. Darnell, saying they, and at least seven others, were refused at the courthouse door. And Ms. Floyd's mother, a state employee with no criminal record, was refused admission. She said, the courthouse security asked me which courtroom I was going to, I told them I was going to courtroom A, they informed me that the courtroom was out of capacity and they were not letting anyone else in. When I expressed my frustration at not being allowed in the courtroom to support my son during his trial, I was told that they were just enforcing the rules, and I was asked to leave the courthouse. Not directed to courtroom 7B, denied access. And who was arguing on the afternoon of October 3rd when this happened? This was not a government, this was not an informant, this was not somebody who was cooperating witness. It was Joseph Dembowski, a forensic chemist with the DEA, who started at 222, right before this turnaway happened, and then followed by Task Force Officer Mark Neptune. The closure wasn't from witness to witness, as I understand. It was not. It was not, Your Honor. It was a generalized restriction on access based on some reasons observed by the court in the courtroom. Well, that's the problem with it, Your Honor. So let's look at the case law on what is termed a partial closure. I'll skip forward to that, which is, so there is the English v. Artoo's case from the Second Circuit, Sedmer opening brief. In that one, the defendant's family was excluded during one witness's testimony, even though the witness wasn't afraid of the defendant's family. Structural error. New trial. And here, this was a blanket, overbroad restriction. Because let me give you another example, which is the United States v. Cervantes case, which is the main case on which the government relies. Because all these cases have talked about, okay, did you still allow the family to be present? Did you still take those measures? Because in the Cervantes case, the emphasis was, was that it was a short duration. It wasn't the entire trial. It was just during voir dire. And they said, and even during voir dire, they made sure, I think there were as many defendants in that case as this one, and they said, well, each defendant gets to have three family members present. And the rest of the time, the defendants got to have family members present. And that is why, in the government's leave authority, there was no new trial order. Family wasn't kept out, as we know happened here. So let me ask you about the timing of this. So are you saying that the defendant's mother in this case, once she was kept out that day, never returned? Or, I mean, what happened? No, she, a record was not made, Your Honor, in that point. There was no contrary record made. So here's what happened. Our clients came forward with evidence from witnesses, affidavits, saying, we are willing to testify more if you hold it here. The motion requested it here. The follow-up motion a week later showed that this had happened again, again with a request for a hearing. And the issue is, is that was this trivial? That's what the cases have focused on. Is it trivial? And is this narrowly, is the deprivation trivial, and is the partial closure broader than necessary? And what happened here was that the trial judge was made aware that this 25-person first come first serve was causing family members to be excluded, or close friends who are treated the same as family under the case law. So let me give you an example, Judge. So I'm sorry, before you get to that. And what did Judge Blake do in response? Nothing. I mean, did she rule on the motion for mistrial? She did not. And the government didn't file an opposition. She did not hold a hearing. She did not rule on the motion, and the government didn't file an opposition. When did she give that big list of reasons why she restricted the courtroom? That was not initial. That was later. That was day three, I believe, Your Honor. Day three, and she explained why she was, what she was doing and why. Yeah. And there was the, a foundation of that was that there would be an overflow courtroom that would be available. And then she was presented with affidavit evidence that it had not been made available. The second motion, the renewed motion, said, I went, I found out about the overflow room, and I said, can I go to the overflow room? And said, we don't have one of those open. Could you call on the walkie-talkie? He called in, and the courthouse security said, I'm sorry, I'm not authorized to open another room right now. And so this wasn't being applied the way that was contemplated. So even if we were to talk about the initial ruling being correct, Rule 51 all requires, Your Honor, the Supreme Court has been very clear about this, including in recent cases. Rule 51 doesn't require you to get a ruling on your objection. You just make the objection. That's it. That's Rule 51. It was made. There was no hearing, which there is no, in the ECF era, there is no question this made it to the judge. Other ECF motions were filed and ruled on during the course of the trial. There was no hearing held. There was no ruling made. And- So can I, so a follow-up to that, so, but there were people in the courtroom when all, I mean, it wasn't, as you have conceded, a complete closure. So is there some case law that somehow heightens, there's a heightened test for exclusion of family members or others? Yes. Justice Black's opinion that we cite in our cases, and let me get you the cite on that. That is Inouye Oliver, 333 U.S. 257, 1948 opinion by Justice Black. Without exception, all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, no matter with what offense he may be charged. And how do we know that he didn't have friends and other relatives present at the time? Well, here's what we do know. The mother had been in the courtroom. This is Mr. Floyd's mother, had been in the courtroom. She left because she needed to pick up the granddaughter and came back and was excluded. And we know that family members were being kept out. So let me give you an example, Your Honor. Was she there the whole trial? What's that? Was she there the whole trial? That is not in the record, Your Honor, because she was there earlier that day. She was there earlier that day, Your Honor. However, what I'm saying is, is that when this evidence came in and it was submitted to the court, that is a hit the brakes moment. And the reason for that is, is because it's structural error if you don't stop, make sure that it's being applied the way it's applied. I'd like to explore that a little more. I understand closure of the courtroom is because of a lot of reasons. I mean, that's what makes the United States different from some of these third world countries where we don't know what's going on in the judiciary. But here we do. I mean, the courtroom's open and there's a large trial and everybody knows what's going on. What we're doing is restricting the size of the audience for reasons given by the district court. So my question is, if the court restricts the size and does so, puts over limits on the restriction, is that structural error? And I'd like to know what case says that. I would say, in terms of the size, there aren't that many cases on this particular issue, Your Honor. I will say the English case. It goes back, principally, it goes back to my point that there are a thousand people outside the courthouse and the courtroom only holds 200. So they let in the 200 and the Supreme Court, you know, lets in people by lottery. Exactly, Your Honor. So my question is, it clearly can't be that it's structural error to exclude people. It is not structural error in that sense, Your Honor. Well, actually, let me take that back. Here's what I'm trying to say, which is every case that has gone through, this is the Cervantes case, the DeLuca case, the Bell case, the Snyder case, these are all cases that have involved where the courts have been assured that family was not excluded during this period of time. If you're going to have these witnesses, you tell the family to show up. If they don't show up on time and they come late, now there's no more room. In other words, I understand the frustration and I understand the whole point. What I'm resisting is the notion that we have this black and white structural error notion when the limitation rules that the court applied aren't perfectly enforced. And if we accept the fact that the court is entitled to limit, as it did, the only argument you're making, it was carried out imperfectly. Well, the problem with it, Your Honor, was that the design first come, first served is  These are working people, Your Honor. The mother. Why isn't it designed for family members? What's that? Why isn't it? Because a lot of people have to have to go to work and we're going when work was done for the day. She was there in the morning before, before that. And my assumption is that if she was that interested that day, she was there every day that she could be there. But Ms. Hamlin was somebody who was coming after work. This was the this was the friend of Mr. Harrison. These are people who, you know, you need to let me give you an example, like the United States versus the Luffy case, Rhode Island Mafia trial. The concerns that were being that Judge Blake was trying to address at that moment. These were issues where it was a mafia trial. There were concerns about bribery, witness intimidation. Instead, what they did was they had a list. They asked for I.D. They came in and was designed to make sure that that the people who the Constitution protects their presence, particularly under the Sixth Amendment. This isn't a press issue under the First Amendment, that this is a this is a restriction that's designed to have those people, the family of the accused. I see I'm down to two minutes. I would want to make sure that I do not neglect my client's issue under under the felon in possession point, because we were waiting on that decision in Greer. If the court doesn't have further questions on the public closure at this time, I would say that Mr. Greer was charged felon in possession of firework. That's the indictment. An argument in here and the opinion in it says felon, felon, felon, felon, felon, and an argument in the government said the rule is unnecessary for any defendant who has a plausible argument why a knowledge of status instruction might have mattered at his trial. All I need is a plausible argument. Well, I've got more than plausible here. The government said in its opposition brief, well, Mr. Fowler was a felon and he knew it because some of his sentences were more than a year. We don't know if he served more than a year, but that's enough. But overlooked, my client was not a felon. He was a misdemeanor. The the state versus Frazier case in our reply brief, I argued that one where it's it's impossible, like, well, not impossible, but you need a lawyer to advise you is the word felon, does it? What's that? Does a federal statute use the word felon? It does not. Yeah. It says that it's one year. And then in the definitions that if it's a state offense, which is labeled a misdemeanor, then it has to be a sentence for which the sentence is more than two years. Yes. And we have a sentence that Mr. Pulling Pullia had a sentence for three years. He was sentenced for three years in one of his misdemeanors. I don't think that's the case, your honor. I could be wrong on that. And I can hold I'm sentenced to three years. And they suspended all of us. I see what you're saying, your honor. But the thing is, is that ordinary people see the signs that were posted on I-83. Are you a felon? You're found with a handgun. You're in prison. The point is, is that felon and misdemeanors are very different concepts. You need a lawyer to advise you that the law uses misdemeanor only in connection with a state offense that's labeled as a misdemeanor. And his offenses were labeled misdemeanors. But then it says the statute is satisfied if the misdemeanor is sent, is sent, could be sentenced for more than two years. Well, he actually received a sentence for three years on one of his misdemeanors. And and so my question is, would that be enough? No, it's not, your honor. And if that is the case, your honor, the government's concession in Greer means nothing. It means nothing. Because as long as a lawyer could tell you you're a prohibited person based on what you did, which is told he was told he was served three years. And the ignorance of the law is not the issue. There was no record made that he was told that as a result, he could not have he could not have a weapon. Yeah, but but rehab makes clear you don't have to know the law. You just have to know whether you were a felon is what they talk about, whether you were a person in that status. Well, as I said, your honor, in that case, I think the government's concession in Greer incorporated incorporated into the Greer opinion has no meaning. I will reserve for rebuttal. OK, thank you. Let's see who we have next. I guess we'll have Mr. Well, well, William Guillaume, your honor, Guillaume, thank you. Yeah, they have the court's rebuttal. May it please this honorable court. My name is Alfred Guillaume and I've been appointed to represent Mr. Linton Broughton. Today, I'm going to be discussing the substantive and procedural unreasonableness of Mr. Broughton's and Mr. Terrell civils, a co-defendant's respective sentences. Your honors, as this court's decisions in the trial of cases, Ross, Webb and Lewis make clear a sentencing judge is to give an individualized assessment of the non-frivolous mitigation factors raised by defense counsel. It's what is noteworthy, I think, in this case that two of the courts, two of this court's decisions, Webb and Lewis, were issued after each gentleman had been sentenced. They were sentenced in mid 2019. And the Ross case was decided in January of 2019. On behalf of Mr. Broughton, the defense raised four mitigation arguments that were not addressed and individualized by the court. One, that Mr. Broughton was lead poisoned as a child. Two, that Mr. Broughton was placed in special education since elementary school. Three, his lack of family structure or support growing up. And four, that he grew up in a drug ridden and impoverished neighborhood. With respect to Mr. Sybils, the counsel raised two arguments. One, the childhood trauma that Mr. Sybils underwent, particularly having drug addicted parents and having found drugs in his possession as a young child from his parents. And two, and most importantly, his severe cognitive disabilities. The judge in Mr. Broughton's case did not acknowledge three of the mitigation arguments at all on the record. Judge Blake did acknowledge the fact that Mr. Broughton had been poisoned as a child by lead, but failed to offer a sufficient individualized assessment of that issue. And with respect to the other three issues, she did not address specifically, but rather mentioned that Mr. Broughton had somewhat of a tough upbringing, but that's an insufficient assessment of those particular, very specific issues on behalf of Mr. Broughton. With respect to Mr. Sybils, your honors, I think Webb is very instructive. In Webb, similar to in Mr. Sybils case, the defendant was given a life sentence in Webb. Let me go back to Broughton. I'm just looking here at what the court said, and the court said, I'm taking into account everything in your memoranda, as well as what was said today. Of course, the evidence at trial and the pre-sentence report, which I'm adopting. Certainly there are mitigating circumstances about Mr. Broughton's childhood, the possibility of unfortunately, of unfortunately lead poisoning, just difficulties in how he was brought up. I certainly understand that. I understand that undoubtedly he has done some good things in his life as well. And he's, uh, he's here convicted of, and she goes on to then say why she doesn't follow those. Now, uh, doesn't this indicate the judge heard your points and considered them and, uh, uh, actually took them into account because she said she did. Your honor. I, with all due respect to Judge Blake, I believe that she just simply addressing the points did not suffice under the trio of cases that we've cited. He says, but there is a very significant need to protect the public here, to recognize the significance of the offense, as well as to deter. I believe Mr. Broughton, as well as other generally, uh, uh, other generally that requires a very significant sentence, despite the mitigating factors that have been pointed out, that seems to me, that's just full consideration. Your honor. I Robinson is that the specific factors with this, other than the lead poisoning were not individually assessed by Judge Blake and fall short of the guidance. The court has given, she took into account what you said in your memorandum, what you said there. Uh, we don't presume that she's lying. Do we? We do not your honor. But I would note that in most cases, uh, district judges, sentencing judges will note or listen to both sides and argue or, excuse me, not argue, but say acknowledge to counsel that they've listened to their argument and this is why they're giving their sentence that they've chosen. However, even if you look at the three cases that we've cited, the judges in those sentences, uh, those cases for each particular sense, they acknowledge defense counsel's arguments, but they did not acknowledge them, uh, adequately. What do you suggest that Judge Blake should have done? Your honor. I would have suggested that with all due respect to Judge Blake, she mentioned specifically the re explained why her sentence, how it related to those particular issues, the particular issues being Mr. Brown's special education, his lack of family structure, uh, and the other issue, which was the, um, I'm not sure I understand what that means, but it sounds like you're just taking issue with the way in which she weighed the various factors in this case. And if that's, I mean, if that's what the argument is, I just don't see how that gets you. Well, you're looking again at the guidance that the court has given in the, on the other cases. And as I was saying a moment ago, if I can pivot to Mr. Sybil's, this is a factual question. And our requirement is that the court demonstrate that it considered it doesn't have to use the actual words, but that it took it into account and individualized the sentencing. And there's a couple of paragraphs here where the court explained what it was doing and it recognized that he's done good things. He's had a difficult childhood, but it said the crimes are pretty serious. And of course, as we all know, based on the convictions, they are pretty serious in this case. Yes, Your Honor. And for us, the key would have been relating how the particular issues related to his conduct of what she was found guilty in this case. Um, her assessment was not done in bad faith. But out of bad faith, what more should she have said? She said she considered those things and, but she said, uh, uh, his conduct requires very significant sentence, despite the mitigating factors, which have been pointed out and she had reiterated some of them. I would argue that in the trio of cases, the judges there acknowledged the mitigation arguments as well. And in particularly in Webb, the court noted that. What do you want her to say? Give me a posit what she should have said further. I think it would be, uh, I don't want to put words in judge Blake's mouth, Your Honor, but an individualized assessment, the way I'm reading it and interpreting it, interpreting it based on the case law is that she specifically as the court that the judges did not do in the three cases that we've cited did not provide a specific, um, assessment of how those particular factors, uh, influenced, uh, the defendant's conduct in a particular case. So, so for example, with respect to lead poisoning, that almost suggested someone would have to bring an expert into court and explain to the district court exactly how that incident, uh, which is horrific, uh, impacted the defendant's behavior, but there was no such evidence. It was just simply a statement that he suffered lead poisoning when he was a child, right? That's correct, Your Honor. But I think if the court looks to the fact that the court allowed me to pivot to Mr. Sybil's for a moment, I see my time is I'm at the two minute mark. Um, the Webb case, I think is very instructive. The defendant in that case was given a life sentence as was Mr. Sybil's, the defendant allocated and the defense council offered, uh, mitigation arguments, which the court acknowledged, but did not give, as I was saying a , um, particularly with Mr. Sybil's, the court did not acknowledge, uh, or given this, uh, excuse me, a good enough assessment of his particular cognitive issues of the things that he suffered as a, as a child, and also of his intellectual functioning, which were contributing factors in his conduct, uh, in this case, ultimately what he was found guilty of. It looks to me, I'm now looking at what the district court said about him, and it's even more than what she said about Broughton. Now, there is absolutely no question that Mr. Sybil's had a very difficult and destructive childhood, that he has the neuropsychological issues that have been documented. It may have been made, it made more likely, at least when he was a younger person as a child, that he would find himself in this kind of activity. And then she goes on and talks about the history of, uh, of violence. So for at this point, the mitigation, the tragedy that we can all sympathize with about his childhood, that is to me outweighed by the need to recognize this most serious of crimes, combination of crimes that he has committed and need to protect the public. And of course, what we had with him, uh, multiple murders, right? Correct your honor. Yeah. Well, um, again, she recognizes his neuropsychological issues and his childhood difficulties and so forth. And, uh, and she said, and she basically said that was outweighed by the conduct. Um, but what she does do as well, your honor is compare Mr. Sybil's situation in life, his station in life to a, I'm going to call it a audience of people that she has created in the saying to the effect that not everyone with his background commits these sorts of crimes, which we feel was an improper assessment of his, um, situation. And your honors, um, my time is running out and I would conclude with that. If the judge Blake had the, uh, benefit of having the three cases in front of her at the time she made the sentence, she would have made a more individualized assessment, which would likely have led to potentially a different result, different sentence for both Mr. Sybil's and for Mr. Brown. And your honors, if there's no further questions, I have nothing further. Thank you, Mr. William. Thank you, your honor. Um, I, uh, I guess we'll now hear from the government manager. Thank you, your honor. Jason Medinger for the United States. Um, your honors, this, uh, appeal features, uh, defendants who were part of a gang, uh, and that gang trafficked in drugs and murder. And in fact, there were six people that were murdered in furtherance of this gang. Uh, we do respectfully ask that this court would affirm, uh, both the convictions and the sentences in all respects. Um, I'd like to jump right in first to issue number four, which my, my co-counsel discussed, that is the capacity limitation that the court put on the gallery. And in our view, I hear the defense asking for an absolutist rule. Essentially, if any family member of any defendant is deprived of the opportunity to see every second of the trial, it is somehow a structural error. And your honors, I respectfully believe that that is not the law. If we look at bell versus EVAT, this is a 1995 case from this court. It said very clearly that courts can impose reasonable, uh, limitations for the fair administration of justice. And that is what was going on here. That was the things that judge Blake was wrestling with. I guess if I hear the argument, uh, being made, uh, it is not really attacking the limitations, but, uh, attacking the notion that the limitations didn't accommodate family, or at least in some, uh, examples. Uh, and, uh, what do you say about that? Well, so I appreciate the argument, but again, I think it miss, uh, takes and, and fails to look at the other competing concerns that are here. Um, we certainly agree that the sixth amendment enshrines a public trial right. But in no means do we believe that that includes what the defense is saying, that every time a family member wants to come into the courtroom, they have the absolute right to do so. Well, let's get into the defendants ever make a suggestion that, uh, we want at least three of our family members to come in that there are eight defendants, three family members have been 24. Did anybody make a practical suggestion about it? So your honor, I don't remember that that specific suggestion was made. I think there was some discussion in the record of when they were trying to figure out, well, what number should we put on this? There was a question to counsel. Well, approximately how many people are going to be here on a day-to-day basis? How many people have been here before? And the number 25 was arrived at based on observations of how many people were generally here. And so I think that's where the number came from. And so I think it was some suggestion that the security officers indicated that, uh, uh, they needed that number was what they could manage. Well, that was also part of it, your honor. Um, but I do think there was some proffer by defense counsel that that generally was the number. Uh, but again, I want to get to the other concerns that are at play here, because again, we have the sixth amendment, no question, but there's also, that's my, I keep questioning, uh, uh, uh, uh, question, Mr. Klepper and I'm questioning you. Uh, it's so easy to make this a closure of the courtroom. The closure of the courtroom is very offensive and it's structural and it  What we did is we limited who could come in then, uh, not who the number who could come in and the argument probably is whether that was reasonable in light of the fact that there were some family members excluded, but I don't know that. I don't know if you should be making a concession that that's a sixth amendment issue. It seems to me, uh, they have a right to be in the courtroom and he should be in the courtroom. Uh, uh, but it's not, we're not talking about structural here. You know, at least I don't know if a case that says it, what we're talking about is the reasonableness of the court's order and the implementation of that order. Precisely. And to be clear from my argument, we believe the sixth amendment was satisfied here, precisely because of what you said, this was not a total closure. This was not a trial in the dark. It wasn't at all. Closure is not the right word. It's a limitation on access because of, in this case, because of security, uh, reported that, uh, during a particular witness, they should pack the courtroom and, uh, uh, to, with the idea of influence and testimony, but, uh, regardless of there were incidents in the courtroom, the court had difficulty in managing the security and this was the court's conclusion. Now, the question is in doing so, uh, was the court unreasonable? And then how should we address it? If the court was unreasonable. Yes, Your Honor. And again, the government agrees completely that a rule of reason does apply. That's what this court's precedent says. And I think that just makes sense. And again, you're right about the very troubling things that were going on here. Uh, they were outbursts from the gallery. There was a fight in the gallery. There were box cutters that were brought into this, uh, gallery. Um, A pencil was carved with the, uh, with the box cutter, uh, with the initials of the gang. Of the gang. And, and there was one very telling incident too, by one of the defense counsels who expressed that when the jurors left every day, they had to essentially run the gauntlet. That's what those of his words were gauntlet. That there was this big crowd of people that the jurors had to sort of go through this scrum to exit every day. And I think the judge was reasonably concerned from a Remmer standpoint of, are there going to be influences on this jury? And, and so again, I think the judge acted absolutely reasonably. Um, and ask about, so, so with respect to this rule of reason, um, would that also apply to the, the matter in which judge Blake, uh, address the concerns that were raised by the defense counsel with respect to the implementation of the, um, you know, the limitations, because, you know, they argue that they raised this matter twice with the district court judge filed affidavits move for a mistrial. And as best as I can tell, it doesn't appear that judge Blake did anything in response to those concerns. Right. So your honor, here's what I can say. I do believe that the rule of reason also applies to this implementation portion of it. Um, again, this court could find that 25 was enough and you didn't even need the overflow, but, but let's focus on the overflow for just a second. If we have to, um, what we have in the record is motions filed October 3rd and 10th, I believe. And I looked through the, the record, the trial transcripts from the days in between there. And I don't see counsel telling judge Blake, we're having this issue. We're having this problem. Um, can you fix it? Can you help us? And so I certainly understand from a record standpoint, they filed motions. Those were on the docket. And so in some sense, they were brought to the court's attention in that respect. But again, there was ample opportunities to say, Hey, your honor, we're having troubles here. And, and I might've missed it. Uh, but I don't believe that I saw a defense counsel tell judge Blake, Hey, this overflow situation is not being implemented. You're saying they have to, uh, repeatedly badger the district court. I'm not saying they have to your honor, but, but again, I'm just talking practically in the space of a trial. If there is this issue going on, I would think the district judge would want to be aware of it. And yes, they, they filed motions to that effect. But I think, again, I think had there been some, some notice and mention of it, it could have been remedied. Um, and that's all, that's all I'm saying filed at the end of the case for a mistrial at the end of the case. Yes, there was. And, and, and the, and in that motion was the, uh, uh, makeup of the daily attendance addressed. I don't believe it was your honor. I think they might have incorporated by reference, all of the objections that they made and therefore it was, and the court denied that generalized motion without particular, I see. Correct. So, so I guess in that respect, one could say that it was, it was ruled upon and that implicitly ruled upon because the court didn't grant a mistrial precisely. Um, so your honor, again, I think reasonableness applies. I just want to mention one other thing about the backdrop of all this. Um, this court is aware of many instances of difficulties of people trying to get into the Baltimore courthouse. Um, so there's the small case and the Beasley case. These, these are under the Remmer situation, but this court has grappled with people trying to influence and intimidate jurors in Baltimore and that simply cannot stand. And here judge Blake was trying to protect the sanctity of that jury. And she has to have the ability to do what she did here. I think I have some recollection in the record that that number of 25 was offered by defense counsel. Again, yeah, I think it was your honor. I think there was some discussion as to, well, how many people are normally here? And I believe a defense counsel mentioned it's generally 25, your honor. Um, so I think in some respects, this was a, um, uh, a number that was arrived at based on input from all the parties. Uh, I do want to move on briefly to the, um, uh, Greer issue with regard to Mr. Pulley. Um, cause that was mentioned, uh, with regard to what you said, uh, judge Neumayer, I think you're right. We have to look at the statute. It doesn't say if they're convicted of a felony, therefore they, well, the definition to be fair, I mean, when, when the, uh, uh, uh, uh, predicate crime is a state crime that is labeled a misdemeanor, uh, the definition then, uh, says that you have the burden of showing that it has to be punishable in order to be compliant, had be punishable for more than two years and, uh, uh, so it, it modifies the one year provision in the statute to that extent when we're involved in the state misdemeanor. And in Pulley's case, Puller, is it Pulley? Pulley. Pulley. In Pulley's case, uh, he was convicted only of state, uh, crimes that were labeled misdemeanors. So we agree with that a hundred percent, your honor. And you're right. It's in a nine 21, a 20 B where we have that. If it's called a misdemeanor, we have to then look to see if it's punishable by more than two years. Uh, so let's just look at every predicate or, uh, every prior conviction that I haven't taken a poll, but I guarantee I could walk up to 10, 10 people, nine of which say you have to be convicted of a felony. They don't read the fine print about the two year thing. Well, that, that might be correct, your honor. But again, I think to judge Niemeyer's point earlier that ignorance of the law is not going to be a defense here. Um, and, and the crimes have to be punishable by more than a year. And if you look at every one of them, it beats it by a country mile. And so, you know, we have drug possession. Uh, that's actually the lowest one, um, under Maryland code five dash 601. That's a four year statutory maximum. Um, if you look at the second degree assault, uh, that's Maryland criminal code three dash 203. That's a 10 year stat max. And then if you look at the attempted heroin distribution, um, well, what's the evidence that he had all those statutes in front of him at any point in time? Well, again, you know, I don't think we have to prove that he himself saw those statutes. But you do have to show that, and I'll just quote Greer here. It says, if a person is a felon, he ordinarily knows he's a felon. So there's that presumption, but, but then it says thus absent a reason to conclude otherwise, the jury will typically find the defendant knew he was a felon, but given this mishmash of statutes that suggests a felon is actually a misdemeanor in Maryland. Why would an ordinary person believe otherwise? Right. So the answer to that question, your honor, is, is what judge Niemeyer was mentioning about the actual sentences that this individual received. Um, he did receive sentences, um, in excess of one year. So therefore he had to have known that he was sentenced. I think the one he was sentenced for 17 months, um, 17 months of custody for that, that one drug possession charge. I think it was one for three years were suspended. One for three years was suspended. So, I mean, he's being told, sir, you are sentenced to three years in prison. Um, anybody of ordinary intelligence knows that, okay, I'm, I've now been to a crime that's at least punishable by more than a year because I got a three year sentence. And so, you know, I think based on that, we're, we're very much in the clear. Um, I would cite the United States versus Caldwell case. Um, that's one of, um, that this court decided, uh, post rear, that person had multiple convictions. They're also, this court also found relevant that the person stipulated at the trial, uh, that they, uh, were subject to this crime that was punishable by more than a year. And here we do have those stipulations. Um, uh, so in that respect, I do think there is, what's the stipulation again? Uh, so the stipulation by the defendant was to the fact that he was defendant pulley, defendant pulley, and he stipulated that he was subject to a crime punishable by more than a year. And I want to be, why do we have an issue at all then? Well, so, so the reason we have an issue, your honor is because we're half added that extra part that he had to know it well, if you stipulate it to it, you know it. Well, so that would be our argument under Caldwell that that stipulation is part. But I think my friends on the defense side would say we stipulated to the fact of a conviction. We didn't stipulate to my knowledge of it. And so that's the little play in the joints. Obviously now the stipulations read differently. They read just like the knowledge has to come from the fact that he was actually sentenced to three years. I think that's part of it. But again, this court in Caldwell said that the stipulation can form some basis to say that he knew. Well, I think it's a valid point that the stipulation is more limited. If it's just the fact of conviction and not the knowledge of the status. It is wrong. And all it says is that he stipulated that he was sentenced to a, uh, an offense punishable by more than a year, right? Is that what it says? Correct. But the Maryland statute requires that the offense be punishable by more than two years in order to satisfy the definition of a felon, right? So you're right. Because of the misdemeanor angle, how do you, how do you connect the dots there? Well, you're not, again, we're, we're trying to look at a plain error. Do we have some sort of miscarriage of justice here? Uh, fact is as judge Diaz points out your statement that he stipulated, uh, contributes nothing because he only stipulated to one year and he would have to stipulate, uh, two years to make it meaningful under the, uh, his record. And, uh, uh, your better argument is that he was in fact sentenced, uh, uh, to, uh, more than two years. But that's right. Your honor, if I could put an analogy on it, the stipulation is a pebble in our argument, the big argument at all. Well, I understand your honor. I'll, I'll, I'll just say the big rock in our argument is the sentence that he received the three years that you mentioned. And I think that's sufficient. Um, I would like to move on briefly to the other issues that were mentioned, uh, issues, uh, 14 and 16, uh, with regard to the procedural reasonableness of the sentences of Mr. Sybils and Mr. Broughton. Um, I do believe that judge Blake appropriately analyzed, uh, why she was imposing these sentences. She weighed those mitigation factors. As you said, uh, your honor, she did say, I've looked at your memoranda. I've considered them. Uh, she did engage with them on the record. Um, if you look at joint appendix, uh, 35, 17, that's where she talks about Mr. Sybils and, uh, weigh the childhood issues, the neuropsychological issues. She mentioned that on the record and just said, look, those issues are not outweighed. They don't outweigh this expansive and horrendous criminal conduct that this gang engaged in. And, and she sat through that entire trial and heard about murder, burning individuals, uh, shooting at them, uh, dealing drugs. Uh, she heard about all that. And so therefore I think it was quite appropriate for her to say those criminal acts outweigh the difficult childhood circumstances that might have existed here. Um, similarly with regard to Mr, uh, Broughton that's joint appendix, page 3458. Uh, that's where, again, she wrestles with, uh, these issues and I believe she made a more than sufficient record, uh, of, I think that the argument and judge Diaz, you kind of touched on this, you know, what, and you too, judge Neymar, you know, what more should she have said? Um, I think the quibble is really, well, she didn't have a more elongated discussion, or maybe the quibble is we didn't like how it came out. Uh, but that does not require a resentencing. That's not the standard. Um, I think she did everything she needed to do for this court to engage in appellate review and decide that she was procedurally reasonable in what she did. I mean, I think the cases, I haven't come back and looked at the trio of cases that Mr. Guillaume mentioned, but at least some of them, but not all of them are cases where the district court said nothing about the, the issues and that that's obviously a concern, but that's, that's not what happened here. A hundred percent, your honor. I think the, the, the cases where there are problems is the total failure cases, the ones where there is just absolutely silence on the record and here there's not that, and so that's why I think we're distinguished from those. Um, so your honors, um, uh, I think I've addressed the issues that were raised by my defense counsel here. I know there's a number of issues in the case, um, unless members of the panel had any other questions about specific issues. Um, I do, um, I have a question about, uh, the sufficiency of the evidence, uh, that Floyd conspired to kill Addison. Uh, what, what do you have on that? Um, certainly your honor, I'll just turn to my. All right. And your honor, this is issue number 11 with regard to the murder of Mr. Addison. You said it's a question of, of the evidence you have against Floyd, defendant Floyd, uh, who was charged with conspiring charge and found guilty of conspiring to, uh, murder Addison. Great. So I think your honor, we have to start first with the wiretap calls. That's the principal basis that we see Floyd's involvement. And so there's a series of calls in April of 2016. I'm familiar with those. How about any in May? Uh, there's one. When was Addison murdered? He was murdered in late May, right? Late May. So, so there's one on May 3rd, um, where they're talking about, um, Mr. Catchings, uh, teaming up with Mr. Addison. Uh, there's also one from, uh, well, May 25th, but that involves Mr. Sybil's that does involve Mr. Uh, Floyd, but obviously they're all in a conspiracy together. Um, and I think if you put, um, uh, under, you know, uh, Pinkerton, I think we can look at Mr. Sybil's his actions as, um, being reasonably foreseeable by Mr. Floyd. Uh, but really it's, it's the wiretap calls. But then the other thing that we have is that testimony of wiretap call that implicates Floyd. So I would say your honor, um, the one from April 14th of 2016, it's joint appendix page 3140. Uh, this is where Mr. Floyd is, is talking to Mr. Baronet and talking about how, um, these guys that they were looking at, um, you know, murdering are over there at Addison's grandmother's house. I think that's the best wiretap call. Um, but what I would buttress that with is the testimony of Tyree Page. Um, and that mostly appears starting at joint appendix page 1685. Um, Mr. Uh, Page discusses how he saw these individuals, um, uh, and overheard these individuals discussing that they were going to commit this murder and then observed them getting into a van. And then later he described the shots that he heard and things of that nature. Was Floyd in that van? Uh, I believe he indicated that Floyd was in that van. Um, I believe he indicated that all these individuals, uh, were there. You mentioned, um, Mr. Baronet, um, uh, Mr. Sybils. Um, he also mentioned, um, uh, I believe your honor, if I'm, if I'm remembering it correctly, I believe that he also indicated that Mr. Floyd was there. Uh, and, and forgive me if I'm incorrect about that, but I think he did. Um, so your honor, I, I think that's the, the sum and substance of what we have as to Mr. Floyd's involvement. Um, you know, again, but we also have, you know, quite a bit as to, to Mr. Baronet and Mr. Sybils. And I think that can be attributed also to Mr. Floyd in furtherance of this conspiracy. Um, so I think your honor, based on that, we have to construe every part of the evidence in favor of the jury verdict. Uh, and I think if you do that, I think it's reasonable and rational for the jury to have reached the decision that it did as to Mr. Floyd, as to the Addison murder. So that was a special murder verdict with respect to Mr. Floyd. And the issue, I guess, is in the context of a RICO, uh, indictment that alleges a number of predicate acts. If we toss one out, I mean, does it really matter in this context? Uh, you know, so, so they found, you know, multiple predicate acts and you're right in the sense that there was more than enough there to sustain, uh, the RICO conviction as to all of them and certainly Mr. Floyd. Uh, so I think you're right about that, your honor. Um, but again, I do think on this record, there is a sufficient amount to say that the jury came to a rational conclusion and we have to respect what they did. All right. Anything else? Uh, nothing, uh, from me, your honor. Um, I thank you for the opportunity to be here. We'll hear from Mr. Klepper. Uh, thank you very briefly, your honor. I, I'm getting back to judge Niemeyer's point about whether Mr. Floyd's mother was there the entire time. I just want to talk, uh, on a, uh, if you've never had a family member on trial with the need for the other family members to hold everything together, I don't think you can really say that Mrs. Floyd, Mr. Floyd's mother, while she should have been there every day, all day to make sure that I was wondering, uh, I would expect that to the extent she could, she was there, uh, but this is just sheer speculation of mother and son type of relationship and, and the fact that she was there, uh, but left and then was unable to get back into the courtroom. Um, uh, is somewhat supportive of notion. She was there from time to time, but, um, uh, and I asked that if I didn't know whether the record has anything about that. Well, here's, here's the thing, your honor, there was the record that a mother of the accused headed out for a moment because of childcare and couldn't get back into the courtroom for the examination of a witness where there was no, no intimidation issues or anything like that. And what happens, your honor, is that in all of these cases, including the partial closure cases, your honor, including the partial closure, they happened here was evidence of substantial because of the government has said, and what the judge said at the very beginning was here is my backstop, which is the audio only overflow. And that's important because if you're there for audio only overflow, you know, when there's a break, you know, when there might be a chance to go down and perhaps check if a space has opened up and they, you know, call the walkie talkie, is it open? No, the judge had concrete evidence. The only evidence in front of her was that the, uh, the measure that she put in place to make sure that family members could get there if they want it to be, was not being complied with. And the courthouse security had no idea. What did she direct in that regard? She directed that courthouse, that room seven DB open for audio only overflow. That is what she directed. And the only evidence your honor was that the courthouse security was like, we don't know anything about an audio only overflow room and we're turning, they turned away nine people, nine people, your honor on October, on October 3rd of trial, nine people, including a close family friend and the mother. And this is critical for the family where this may be the last time before their child is sent off to Terre Haute, Indiana, or something like that is a chance to be there in the moment of need. And this is critical, your honor, this is critical. I mean, when I say, have you ever been there? I say, as a child of the criminal justice system, have you ever had a parent go away to prison? I have. Have you ever had the sheriff come to take away the family car, which is being used to make money? Yes, I have. This is critical. A partial closure that says you cannot be here. And this, uh, this is to, uh, I'm using the wrong word, but, uh, I don't mean dystopian, but going in and saying, no, turn around. But we were told this is open. No, we don't know anything about it. And the judge, upon hearing that, should have hit the brakes and made a record that was trivial. And every single case from, uh, that we have cited and that the government cites, there still must be a showing of triviality when there is a known deprivation, because every single case says there is not any evidence that a family member was excluded for a key period of time. That is what is said in the case law. And this is critical, your honor. Who was the witness testifying in that, uh, at that moment? I'm sorry. What was that? What, which witness was testifying? Do we know? Uh, yes, we do, your honor. This was, I will draw that very quickly. It was the forensic chemist. You did mention that. The forensic chemist and, uh, uh, TFO Neptune. These were not people like in the cases where the support has affirmed, oh, this is a vulnerable witness who might be, uh, abashed by this. This wasn't the judge had learned that the safeguard that was put in place was not working in courthouse security. Wasn't doing it. No record of triviality was made. That is a hit the brakes moment. So you can make sure and make corrections, do triviality. We know that eight days later, after the first notice that nine people had been turned away, the courthouse security still knew nothing, nothing about courtroom 70, supposing to be open, called someone, call someone. No, no one there. This is the kind of thing that, you know, the family, they are there. They, much of the justice system is giving the family an explanation of all of this. This is critical. And so the suggestion, this is not a sixth amendment issue. When the judge knows that family members are not allowed to be, are not allowed in the courtroom. That is, this is sixth amendment. And so I, I just want to say that in the strongest terms, this is why we have it. It's not just star chamber. This is about the interest of families being there. And when this motion for mistrial was made, it cited it. Counsel cited, you are excluding family members. You're excluding close friends. This is a problem. This is structural error. And the trial judge did nothing. I'm over my time. I don't have much to say on the Addison point, the Floyd Addison point, which was brought up, but here's what I will say on this. It is a red flag when the government citations for many of the facts are from the pre-sentence report. Pre-sentence report serves a very particular purpose in our criminal justice system, and it is not to show that there was sufficient evidence of the crimes. And so, especially now with all these spaghetti boy type things where nothing seems quite add up, that that is something where, well, we're talking about enhancements, we were talking, you know, this is something where the court should care about whether there was adequate evidence before the jury. All right. Thank you, Mr. Mr. Thank you again, your honors. Just briefly in rebuttal, I would address directly a point that judge Niemeyer and Judge Dee has made as to what should judge Blake have said or done differently. I would just offer that each case is going to be a case by case basis. And I think it will be clear from the record of the particular case of, of the answer to that question. So in other words, I don't have an exact word to provide you today, but I think it's an individualized assessment. It speaks to a case by case basis. And I would also like- Well, you really get down to, this is not a mechanical cookbook type of formula that is imposed. The whole idea is that the court give enough reasons to enable us to review what's going on and the reasons why the sentence was imposed. It's a, it's a, this is instruction right from the Supreme Court and that's the standard Supreme Court imposed that is sufficient for us to conduct a review. And in this case, the court clearly acknowledged the mitigation aspects and then concluded that the particular conduct was outweigh, outweighed that in this particular case. And so my point is, what more would the court have to say? We know the court considered it, it weighed and it ended up at this judgment level for a sentence. And so the question then we review is for abuse of discretion. Well, Your Honor, addressing that and sort of segwaying into my last point, which is another point that Judge Diaz made with respect to cases where judges were silent or hadn't said much, I would argue that Webb was not one of those cases and Webb, the defense counsel gave very specific arguments, which were acknowledged by the court. And the fact the court said that everything that you're saying to me now goes against what your client said in allocution. And this court in giving a life sentence in the district level still felt that that was necessary. It was the reversal was necessary. And I would argue that that case of all the three cases is potentially the most analogous to our case here today. Your Honor, I have run out of time. There's no further questions. I conclude my presentation. Thank you, Mr. William. Thank you very much. First, let me recognize, I guess, Mr. Clefler, Mr. William, you are court appointed and, you know, this is just an enormously important function. We want to acknowledge that service. This is a case where, in particular, we need good counsel because when you have a high profile case that where the defendants are the targets, not only of the courts, but of the public, it's important to have good counsel. And we appreciate your service in this case very much. Our practice is to come down and greet counsel and then view the pandemic protocols. We're still not doing that, but I think all of you will be back and we'll shake your hands again at that time. Maybe double shakes and cover. Many thanks. We'll proceed on to the next case. Thank you, Your Honor.
judges: Paul V. Niemeyer, Albert Diaz, Henry F. Floyd